# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF VIRGINIA ABINGDON DIVISION

**CHRIS VERNON BLEVINS, JR.**
    **Plaintiff,**
**v.**                                                              **Civil Action No:**
                                                                    **JURY DEMANDED**

**CABELA'S WHOLESALE, INC.**
**d/b/a "CABELA'S,"**

**WENDY BREWER, individually, and in her**
**official capacity as a police officer of the City of**
**Bristol, Virginia, and**

**PATRICIA ELLER, individually, and in her**
**official capacity as a police officer of the City of**
**Bristol, Virginia**


    **Defendants.**

## SECOND AMENDED COMPLAINT

Comes the plaintiff, Chris Vernon Blevins, Jr., by and through his counsel,

and files this Second Amended Complaint, pursuant to Rule 15(a)(2) of the Federal

Rules of Civil Procedure, and for cause of action against the defendants,

CABELA'S WHOLESALE, INC. d/b/a "CABELA'S" ("Cabela's"), WENDY

BREWER ("Brewer"), individually, and in her official capacity as a sergeant

police officer of the City of Bristol, Virginia, and PATRICIA ELLER ("Eller"),

individually, and in her official capacity as a sergeant police officer of the City of

Bristol, Virginia, would show this honorable Court as follows:

1

## STATEMENT OF DIVERSITY JURISDICTION AS TO CABELA'S

The plaintiff is a citizen of Virginia. The defendant Cabela's is a corporation incorporated under the laws of Nebraska with its principal place of business in Nebraska. The amount in controversy, without interest and costs, exceeds the sum or value specified by 28 U.S.C. §1332.

## STATEMENT OF FEDERAL QUESTION JURISDICTION AS TO BREWER AND ELLER

Pursuant to 28 U.S.C. §1331, this Court has subject matter jurisdiction in this case as to the 42 U.S.C. § 1983 claims made herein against the defendants Brewer and Eller.

## STATEMENT OF SUPPLEMENTAL JURISDICTION AS TO BREWER AND ELLER

Pursuant to 28 U.S.C. §1367, this Court has supplemental subject matter jurisdiction as to all other claims made herein against the defendants Brewer and Eller because they are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy.

# FACTUAL ALLEGATIONS

1.      The plaintiff is Chris Vernon Blevins, Jr., a citizen and resident of Washington County, Virginia.

2.      The defendant Cabela's does business as a retail store known as "Cabela's" at 361 Cabela Drive in the City of Bristol, Virginia and other locations in Virginia and many other states.

3.      The defendant Brewer is a resident of Virginia, and at all times pertinent to this cause of action, was acting as an employee of Cabela's while an off-duty sergeant police officer of the City of Bristol, Virginia in City police uniform and carrying City badge, firearm, Taser, and handcuffs.

4.      The defendant Eller is a resident of Virginia, and at all times pertinent to this cause of action, was acting as an employee of Cabela's while an off-duty sergeant police officer of the City of Bristol, Virginia in City police uniform and carrying City badge, firearm, Taser, and handcuffs.

5.      The day after Thanksgiving Day is a popular shopping day known as "Black Friday."

6.      Cabela's offered a 5:00 a.m. opening on Black Friday, November 24, 2017 and a promotion for the first 600 customers entering its Bristol, Virginia store.

7.      The plaintiff and his girlfriend, Caitlin Poole, arrived at the store at approximately 4:00 a.m. on Black Friday, November 24, 2017, to take advantage of the promotion and buy snow boots for their five-year-old son.  They stood in the long line of multiple hundred customers outside the store until the store opened. Cabela's gave them each promotional material while in line, including customer numbers 206 and 207 and $10-off coupons. It was cold.  Cabela's provided coffee and doughnuts for the waiting customers at an outside table on the sidewalk. Plaintiff wore a jacket and vest and carried the vehicle keys, cigarettes, cell phone, and a wallet containing the cash to make the purchase. Ms. Poole wore a jacket. As was their habit when shopping together, Ms. Poole drove, left her purse in the vehicle and gave her keys to the plaintiff for him to hold while they were shopping. Prior to coming to Cabela's, the plaintiff and Ms. Poole had been shopping all night at other stores and had several bags of purchased items from other stores in the vehicle.

8.      At the store's opening, the plaintiff and Ms. Poole entered the store. The plaintiff briefly lost sight of Ms. Poole in the entering crowd rush, but quickly found her, she had obtained a shopping cart, and the two first looked at the hoodies on display near the front of the store.  Plaintiff did not find his size, they then walked together with the cart toward the shoes and boots section near the rear of the store, located the children's snow boots, requested and received a floor clerk's

assistance, placed the boots in their shopping cart, and joined the back of a long checkout line that curled and stretched from the rear of the store to the cashiers located near the front exit of the store.  Because it was getting warm inside the store, plaintiff took off  his jacket and vest and laid them in the cart.  Plaintiff told Ms. Poole that, while she waited in the long line with the cart, he was going to look for .410 shotgun shells for their son's small shotgun.

9.      While Ms. Poole remained waiting in line with the shopping cart, the plaintiff first went to the water fountain and bathroom at the front of the store, then briefly stepped outside to the sidewalk to see if the coffee and doughnuts were still available, they were not, he re-entered the store, used the water fountain again, and then walked to the hunting, archery and firearms area toward the rear of the store to find the .410 shotgun shells.

10.     While in the hunting, archery, and firearms area, the plaintiff noticed a Primos Trigger Stick tripod display sample with a demonstration video on an endcap. A customer couple was examining the endcap display sample. The partially packaged tripod legs protruded down from the packaged top of the Trigger Stick. While one of the couple was handling it, the tripod legs fell off.  The plaintiff and the customer remarked to one other that it was cheaply made. Plaintiff picked up the tripod and tried to re-attach it but was unable due to the packaging and left it.  Plaintiff then noticed that a female uniformed police officer, later identified as the defendant Eller, had been observing him in close proximity.  He

politely greeted the officer who responded, "I am just doing my job." Plaintiff left the display, noticed a marked-down backpack nearby that was on discount, examined it, decided not to buy it and put it down. Because Cabela's has a large ammunition section, the plaintiff went to a nearby customer service desk to ask where the .410 shotgun shells were located. He recognized there a store customer service employee named "Wayne." He knew Wayne because they used to work at Walmart together. Wayne recognized the plaintiff as well. Wayne led him to the .410 shotgun shells and they briefly chatted. The plaintiff noticed a second female uniformed police officer, later identified as the defendant Brewer, had been following him.

11. Plaintiff selected a box of the .410 shotgun shells to purchase, rejoined Ms. Poole, and they continued the wait in the checkout line. While waiting in the checkout line, plaintiff used his cell phone to find out if the .410 shells might be less expensive at Walmart. He learned that they would be less expensive, decided not to purchase them, took them out of the cart and set them aside. He noticed that he was being watched by the defendant police officers. He noticed that Eller was standing just past the cashiers watching him. Brewer was standing also nearby toward the concession area watching him. By then, the plaintiff had taken his vest and jacket out of the cart and had put them back on. He gave Ms. Poole a $100 bill and his $10 discount coupon to add to her $10 discount coupon to pay for their child's boots. Unknown to the plaintiff, a plainclothes asset

prevention employee of Cabela's named Eric Turner was standing with Eller and was also watching the plaintiff. Mr. Turner is a former City of Bristol Virginia police officer and a close colleague and friend of Eller and Brewer. Eller then said to Mr. Turner and Brewer that, according to a written statement of Brewer, "she thought she saw him conceal some ammo." Brewer and Mr. Turner also had their eyes on the plaintiff at the same time Eller did and neither saw plaintiff conceal any store merchandise. Moreover, store camera surveillance, which was monitoring the situation, did not observe plaintiff conceal store merchandise. Mr. Turner advised Cabela's Asset Prevention Manager, Brad Mullins, to come to the checkout area because Brewer, Eller, and Turner, based on Eller's "thought," made the decision to detain the plaintiff when he walked out the exit. While Ms. Poole was paying for the boots, plaintiff returned the shopping cart and walked toward the exit to wait outside on Ms. Poole while she finished her purchase with the cashier. Ms. Poole was told by the cashier that she could not combine their $10-off coupons for the purchase of the boots.

12.     Plaintiff stepped outside the store. Eller and Brewer, and then Mr. Turner, followed out behind him. Without probable cause, Eller grabbing the plaintiff's left arm from behind, told him he was under arrest for shoplifting, and to put both hands behind his back. Plaintiff instinctively jerked his left arm back, looked over his right shoulder to see who had grabbed him and saw the officers. Plaintiff insisted he had not taken anything. Plaintiff begged the officers to look at

the store surveillance video. He did not flee, or give any indication that he was going to, was being accused and detained, without probable cause, of a minor, non-violent offense of which he was entirely innocent, and exhibited no danger to anyone. Brewer told him he was getting Tased and nearly simultaneously Tased him on his back using the "drive-stun" mode while she and Eller took him to the ground. Brewer used her X26P Taser, a dangerous shock weapon designed to deliver high-voltage electricity to the body and inflict excruciating pain in the "drive-stun" mode. He was Tased again one or more times by Brewer while on the ground, and then handcuffed so tightly that his wrists were injured. Eller told plaintiff she did not have to look at the surveillance footage because she saw him shoplift. The electric shocks left multiple lesions on plaintiff's back.

13.     Plaintiff was then searched by the defendant officers who emptied his pockets, but plaintiff was found to have no store merchandise in his possession. Mr. Mullins arrived and examined the items removed from the plaintiff's pockets, verified that nothing found on the plaintiff belonged to Cabela's. Plaintiff begged Mr. Mullins to examine the surveillance footage, and Mr. Mullins said that he would. However, Mr. Mullins failed to direct the officers that the plaintiff should be released while he went back inside the store to review the video surveillance.

14.     The defendant officers and Mr. Turner then realized that they detained, Tased, and handcuffed an innocent customer. They knew that the surveillance footage would show that plaintiff had not shoplifted because they had

their eyes on the plaintiff the entire time he was in line and Eller's "thought" that plaintiff had concealed a store item was simply wrong.  But, instead of releasing the plaintiff, Brewer told plaintiff and Ms. Poole that *she* had seen plaintiff repeatedly exit the store, go to his vehicle, and then return back inside the store. This was not true.   The officers told plaintiff this as a pretext to obtain his consent to search the vehicle in hope they might find contraband of any kind that would justify their arrest, handcuffing and Tasing of the plaintiff.  Plaintiff told the officers that he had not been back to the vehicle since his arrival, which was true. The officers then asked him where his vehicle was parked and insisted that he and Ms. Poole agree that they be allowed to search his vehicle.  Brewer had the keys and would not return them to plaintiff or Ms. Poole.  Plaintiff was still in the excessively tight handcuffs, was still suffering from the embarrassment, humiliation, shock and pain of being handcuffed and Tased, and he and Ms. Poole believed that unless they consented to a vehicle search plaintiff was not going to be released by the officers and get their keys back. Ms. Poole and the plaintiff relented and agreed to the search hoping the officers would release plaintiff from the handcuffs and give them the keys. The officers asked them where the vehicle was parked.  They told them where the vehicle was parked.  Without probable cause, and with the malicious intention of trying to discover contraband of any kind that would give probable cause for an arrest of the plaintiff for any crime and justify their actions, the officers continued with their detention of the plaintiff,

walked him to the vehicle in handcuffs in the company of Ms. Poole and in view of the public, and then Brewer thoroughly searched the vehicle while plaintiff stood by in handcuffs in the custody of Eller. Ms. Poole was ordered by the officers to stand aside away from the plaintiff and the vehicle.  The search included going through the entire passenger compartment, glove box, their shopping bags, their tangible personal property, and spare tire area. Brewer found no stolen store merchandise or contraband of any kind in the vehicle.

15.     Mr. Mullins then called Brewer and advised her that surveillance showed the plaintiff had not shoplifted, directed them to release the plaintiff, but to inform him he was banned from Cabela's.    Brewer told Eller that plaintiff was "in the clear."  The transport police vehicle which Brewer had requested to take plaintiff to jail arrived on the scene. Brewer sent it back.

16.     The defendant officers did not immediately release the plaintiff.  One of the officers apologized to the plaintiff, but the other officer told the plaintiff he could no longer come back to Cabela's because of his "behavior."  The officers then persistently asked the plaintiff, while keeping him in handcuffs, that he acknowledge to them that they had not done anything wrong and had just been doing their job.  He did so acknowledge, but only in hope that they would finally release him from the handcuffs.  He was then released from the handcuffs, the keys were returned, and he and Ms. Poole left in their vehicle. Plaintiff was never charged with theft, resisting arrest, public intoxication, disorderly conduct, or any

other crime. The officers went back in Cabela's to continue with their Black Friday duties for Cabela's.

17.     After plaintiff was released and he and Ms. Poole were permitted to leave, both Brewer and Eller made handwritten signed statements to Cabela's using its "Associate/Witness" statement forms as Cabela's required as a duty of the defendant officer's employment, as did Mr. Turner.  The statements bear the date of November 24, 2017, the day of the incident.   Brewer and Mr. Turner intentionally omit from their statements the Tasing of the plaintiff and the vehicle search.   Neither Brewer nor Mr. Turner state they saw the plaintiff conceal anything in his jacket while in the checkout line.  Eller and Brewer stated what initially drew their suspicion of the plaintiff, but that the decision to detain him was because Eller says she saw him conceal an "item" in his jacket zip-pocket while in the "check out lane."  Eller does not describe the "item."  Brewer and Turner claim Eller told them it was a box of "ammo." Eller's statement to Cabela's concludes:

> *After he was secured, he was searched and his vehicle searched.  No items was [sic] found from the Cabela's store.  He had put a pack of cigarettes in his pocket. Chris Blevins was release [sic] after the investigation without further incident.*

The plaintiff denies that he was acting suspiciously in the store or could have construed to be acting suspicious by an ordinarily prudent person. All of his actions in the store were within the norms of innocent and common customer behavior.  He also denies that Eller saw him put anything in his jacket zip-pocket

while in the checkout line, and if he did, that the item could not have been construed by an ordinarily prudent person to be store merchandise, especially "ammo." Moreover, even if the defendants mistakenly but honestly believed they had probable cause to detain the plaintiff because Eller thought he had concealed a store item in his jacket pocket zip-pocket while in the checkout line, that belief evaporated once plaintiff was searched and found to have no store merchandise. He denies that he left the store to return to his vehicle at any time between when he first entered the store on Black Friday and when he was detained by the officers, or that anyone saw him do so. The decision to keep plaintiff detained and in handcuffs and search his car, after his person was searched and found to have no store merchandise, was without probable cause and was malicious. As reported in a February 28, 2018 *Bristol Herald Courier* local newspaper article, an admission was made to the reporter by defendant Cabela's former asset prevention manager, Brad Mullins, that he had viewed the store surveillance video footage of the actions of the plaintiff inside the store on Black Friday, that Mr. Mullins *saw nothing suspicious,* and that, "*The guy* [the plaintiff, Chris Blevins] *hadn't done anything wrong.*" This admission contradicts the statements of Brewer and Eller that they observed suspicious activity by the plaintiff inside the store. Plaintiff alleges that Brewer and Eller's claims of observations of suspicious activity of the plaintiff were intentionally exaggerated, and malicious, to cover up their wrongful

detention, Tasing of the plaintiff, and the unlawful search of his person and personal property.

18. **<u>Respondeat Superior</u>**: During all pertinent times and events described in paragraphs 3 through 17 above, Brewer and Eller were privately hired and being paid by Cabela's for "Black Friday" security for the protection of Cabela's property and crowd control and were acting as the servants, employees and/or agents of Cabela's, while in the status of off-duty City of Bristol Virginia police officers. There was no "extra-duty" or "off-duty" employment agreement between Cabela's and the City of Bristol, Virginia agreeing that the officers would remain employees of the City of Bristol acting as a law enforcement officers while working for Cabela's. They were selected by Cabela's. They were paid by Cabela's on an hourly basis. They were subject to the instruction, management and control of Cabela's. At all material times to this incident, they worked in concert with each other and Cabela's regular loss prevention store employees. Their services could be terminated at any time by Cabela's. They followed the orders of Cabela's as to whether or not to detain suspected shoplifters, continue detention, and were given the authority to ban a customer from the store if directed by management. As part of their employment, they were required by Cabela's to file written statements regarding the incident to Cabela's using Cabela's forms. After the events described in paragraphs in paragraphs 3-17 above, they continued in their employment with Cabela's performing Black Friday security duty for the

protection of Cabela's property. The City of Bristol Virginia did not adopt an ordinance, as permitted by Code of Virginia §15.2-1712, which would permit off-duty police officers to accept private employment for the performance of official duties. Without an authorizing ordinance, a police officer who accepts money privately for performing official duties violates Code of Virginia §2.2-3103. Brewer and Eller accepted money from Cabela's to perform services for Cabela's, and they must have either not been performing official duties for Cabela's, or were performing official duties in violation of §2.2-3103.

19. December 1, 2017, plaintiff personally asked for a copy of the police incident report from the City of Bristol Virginia Police Department. The only report on file was the Call for Assistance (CFS) dispatch report for when Brewer requested the police transport vehicle. Neither Brewer nor Eller had filed a proper police incident report with the department as required. Moreover, Brewer did not file the separate use-of-force report to her superiors at the City of Bristol Police Department as required by the department regulations when an officer uses force, *even though she is the police department's Taser instructor and was well aware of the department's requirements.* The reason why Brewer and Eller did not report the use of the Taser and a proper incident report was because they either believed they were not performing official duties and knew that their detention and Tasing of the plaintiff might be considered without probable cause and an excessive use of

force. They feared that their improper actions, if discovered by the department, would subject them to internal investigation, discipline, and liability.

20.     On January 16, 2018, a local newspaper published some of the allegations of the original Complaint, including the allegation that plaintiff was Tased by unidentified off-duty City police officers employed by Cabela's on Black Friday.

21.     On January 24, 2018, in a follow-up newspaper article, City of Bristol Virginia police Lt. Charles Robinette is reported as saying that the police department supervisors had no knowledge of the incident and Brewer's use of her Taser on Black Friday at Cabela's until it was learned from the January 16, 2018 newspaper article. The article further reports, "Any incident in which a Taser is discharged requires supervisor notification and a use-of-force report, according to city police department policy. Robinette said there are generally repercussions for an officer when a required report is not filed." The department has launched an internal investigation.

22.     Police department supervisors confronted the defendant officers and ordered them to file a late incident report and for Brewer, to file a late use-of-force report.

23.     In the use-of-force report she filed on January 22, 2018, Brewer said she "drive-stunned" plaintiff with her X26P Taser twice on his back to coerce him to comply with her verbal commands to show his hands. Plaintiff denies that he

was not compliant, denies that was the purpose of the Tasing, and denies that the Taser was a reasonable use of force. Plaintiff denies that the officers had reasonable cause to Tase him, handcuff him, or take him to the ground.

24.     On the form use-of-force report, there is a question for Brewer to mark "yes" or "no" as to whether the suspect was "under the influence of alcohol or drugs." In an attempt to justify her use of the Taser, Brewer marked "yes." Plaintiff vehemently denies that he was under the influence of alcohol or drugs, or was using alcohol or drugs at all.  Brewer's statement that the plaintiff "was under the influence of alcohol or drugs" was never made in any prior statement or report of any witness, including Eller, Mr. Turner and even Brewer herself, until after the filing of this suit and the institution of the internal investigation of Brewer by the City police department. Brewer's statement is false, defamatory, and evidence of actual malice by Brewer toward the plaintiff.

## COUNT I - FALSE IMPRISONMENT/WRONGFUL DETENTION

25.     The plaintiff incorporates herein the allegations in paragraphs 1-23 above.

26.     Defendants' actions described in paragraphs 12-17 above were without probable cause, and a false imprisonment and wrongful detention of the plaintiff for which the defendants are liable to the plaintiff.

## COUNT II – ASSAULT AND BATTERY/EXCESSIVE USE OF FORCE

27.     The plaintiff incorporates herein the allegations in paragraphs 1-23 above.

28.     Defendants' actions described in paragraphs 12-17 above were an unreasonable excessive use of force and an assault and battery of the plaintiff.

## COUNT III – DEFAMATION

29.     The plaintiff incorporates herein the allegations in paragraphs 1-23 above.

30.     The declaration by Eller as described in paragraphs 12 and 14 above that plaintiff was a "shoplifter" were false, were made without reasonable grounds, and were a defamation of the plaintiff by Eller for which she and Cabela's are liable.

31.     Additionally, Brewer's declaration that plaintiff "was under the influence of alcohol or drugs" as described in paragraph 24 above was a defamatory made with actual malice for which she is individually liable to the plaintiff.

## COUNT IV—TRESPASS

32.     The plaintiff incorporates herein the allegations in paragraphs 1-23 above.

33.     The defendants' search of plaintiff's person, the items on plaintiff's person and his items in the vehicle searched was a trespass.

## COUNT V-CLAIMS UNDER 42 U.S.C. 1983
## AGAINST BREWER AND ELLER

34.     The plaintiff incorporates herein the allegations in paragraphs 1-33 above.

35.     Brewer and Eller's excessive and unreasonable use of force, assault and battery, defamation, trespass, and unreasonable search and seizure of the plaintiff and his tangible personal property, while acting under color of state law, deprived plaintiff of federal rights granted to him by the Fourth and Fourteenth Amendments of the United States Constitution.

## DAMAGES – COMPENSATORY

36.     As a proximate result of the above-described common law tortious actions of the defendants and the deprivation of plaintiff's federal rights by Brewer and Eller, plaintiff has suffered physical and emotional injuries, pain, suffering, distress, anguish, embarrassment, humiliation and loss of reputation, and will continue to do so.

## DAMAGES – PUNITIVE

37.    The actions of the defendants as described in paragraph 14-24 above were actually malicious in that the officers knew that plaintiff was innocent of shoplifting, but continued his detention in hopes that they might search his vehicle and find evidence of some other crime to justify his arrest, all for which the plaintiff should be awarded punitive damages.

38.    Brewer's declaration as described in paragraph 24 above was defamatory and made with actual malice, for which plaintiff should be awarded punitive damages against Brewer individually.

## DAMAGES AND RELIEF SOUGHT

The plaintiff, Chris Vernon Blevins, Jr., demands judgment against the defendant, Cabela's Wholesale, Inc., Wendy Brewer, individually, and in her official capacity as a sergeant police officer of the City of Bristol, Virginia, and Patricia Eller, individually, and in her official capacity as a sergeant police officer of the City of Bristol, Virginia, in the amount of $350,000 nominal and compensatory damages and $350,000 punitive damages, the costs of this action, in addition, and such other and further relief as this cause may require.   In addition, as provided by 42 U.S.C.§1983, plaintiff  seeks nominal damages, compensatory damages, punitive damages, and his  attorney's fees, litigation expenses, and costs against Brewer and Eller.  Plaintiff also seeks general relief. A jury is demanded.

**CHRIS VERNON BLEVINS, JR.**


<u>/s/ Timothy W. Hudson</u>
BY:  Timothy W. Hudson, Esq.
Attorney for Plaintiff
131 Eighth Street
Bristol, Tennessee 37620
(423) 968-3106
(423) 968-2108 (fax)
VSB No: 22929
tim@timhudsonlaw.com


## CERTIFICATE OF SERVICE

I certify that I will electrically file the foregoing with the Clerk of the Court using the CM/ECF electronic system, which will then send notification of such filing to the following counsel of record this day 13th day of March, 2018 to:

Joshua Matthew Hoffman, Esq., counsel for the defendant Cabela's
2325 Dulles Corner Boulevard
Suite 1150
Herndon, VA 20171 (and by email)

I certify that I will mail by United States Postal Service a copy of this document this day 13th day of  March 13, 2018 to:

Sgt. Wendy Brewer, defendant, *pro se*: c/o City of Bristol Virginia Police Department, 501 Scott ST, Bristol VA 24201

Sgt. Patricia Eller, defendant, *pro se*: c/o City of Bristol Virginia Police Department, 501 Scott ST, Bristol VA 24201

<u>s/ Timothy W. Hudson</u>
Timothy W. Hudson, Esq.